IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JUSTIN M. MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | 2:21-cv-00870-CB |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| LAURA WILLIAMS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

**I. MEMORANDUM**

Defendants' Motion for Summary Judgment (Doc. 136) will be granted.

Plaintiff was a pretrial detainee at the Allegheny County Jail ("the Jail"). He filed this case over three years ago, complaining of his treatment by Jail-staff during a self-imposed hunger strike. His refusal to eat lasted from December 15 through December 18, 2020. 2d Am. Compl. (Doc. 75) at ECF-header pgs. 13-14 (hereafter, page numbers refer to the ECF-header pagination).

Plaintiff originally challenged numerous aspects of the Jail's handling of his hunger strike, and his suicide watch that shortly preceded it, but all of his claims have been dismissed except one: the Jail's failure to provide "prednisoLONE Acetate Ophthalmic" eye drops, prescribed for a "possible macular edema" in his left eye (swelling of the retina). *See* Pl.'s Exs., filed under Doc. 144, and, specifically, Doc. 144-1 at pg. 2. The eye drops did not travel with Plaintiff from his cell in solitary confinement to the "Medical Housing" unit where he was kept during the hunger strike, referred to by both sides as "5C." Pl.'s Doc. 144 at ¶ 3. Rather, the eye drops container was "removed from [his] cell and put in a property bag," because detainees were

not allowed "property while in medical observation," aside from clothing and a mattress. Pl.'s Doc. 146 at ¶¶ 10-11; *cf.* Defs.' Stmt. of Facts (Doc. 137) at ¶ 11.

Jail records reveal that eye drops were administered on December 15, 2020 at 8:37 p.m., *see* Doc. 137-10 – and then again on December 17, 2020 at 12:43 p.m. *See* Doc. 137-11. The period between treatments was roughly 40 hours. Doc. 137 at ¶¶ 10-12 (acknowledging that eye drops were not administered on a single day, December 16th).[1]

Although Plaintiff claims to have suffered "much damage" as a result, *see* Doc. 146 at pgs. 4-5, his own evidence is plainly to the contrary. *Only two weeks later*, on December 30, 2020, an ophthalmologist examined Plaintiff in person and reported "a totally normal eye exam." Pl.'s Doc. 144-1 at pg. 1. The doctor wrote:

> The left eye . . . reveal[ed] an entirely normal exam with no inflammation or cataract. There [was] a clear vitreous with no . . . detachment, evidence of trauma, tears or detachment. The nerve [was] healthy and pink with 0.6 cupping. The macular reflex [was] sharp and free of traction, edema or hole.

---

[1] Plaintiff himself relies extensively on the Jail's records, and has offered no evidence in rebuttal. Rather, he offers only a general assertion that, "[f]rom the evening" of December 15th to "Dec[ember] 18[th] at 9:00 p.m., [he] was denied *access* to [his] eye drops." Pl.'s Doc. 146 at ¶ 2 (emphasis supplied). This is consistent with his acknowledgement that detainees were not permitted to bring property into 5C. Plaintiff's statements do not conflict, because both things could be true: Plaintiff himself was not permitted to maintain possession of the eye drops in 5C; yet, eye drops were administered at the dates and times reflected in the medical records. Plaintiff's recounting of events that transpired near four years prior, while he was in the midst of a hunger strike, does not exactly inspire confidence in terms of being an accurate and reliable "historian." On summary judgment, Plaintiff enjoys the benefit of *reasonable* inferences, and any suggestion that his present conclusory statements are superior to contemporaneous medical reports (recorded before Plaintiff's "eye drops claim" logically could be anticipated) is not reasonable. A corollary result is reached, from a slightly different angle, through an application of black letter law. Kling v. U.P.M.C., 2021 WL 3667918, *17 (W.D. Pa. May 7, 2021) (on summary judgment, a non-movant "cannot rest [on bare] assertions . . . in the pleadings," or "rely on merely colorable, conclusory, or speculative evidence") (citation to binding authority omitted).

*Id.* On these findings, the doctor found a CT scan to be unnecessary, and he opined, "based on [his] 30 years of experience with ocular trauma," that Plaintiff was "suspect[ed of] malingering." *Id.* Perhaps failing to fully comprehend the implications of his own evidence, Plaintiff also specifically quotes a report from his optometrist less than two weeks later, on January 11, 2021. Pl.'s Doc. 146 at ¶ 13. The report indicated that Plaintiff "was told" by the ophthalmologist that he had "minimal retinal edema at that point," and Plaintiff indicated that his "V[isual] A[cuity]" was "slowly improving." Doc. 146-8. The optometrist prescribed an NSAID pain reliever and indicated, based on Plaintiff's present condition, that his next visit should be three months later. *Id.*

On the above record, Plaintiff insists, there are triable issues of fact. He is incorrect. First, he has failed to overcome Defendant's evidence showing his failure to exhaust administrative remedies. Plaintiff filed no fewer than 186 grievances during his period of detention. Doc. 137-19 at ¶¶ 6-10.[2] He filed at least 171 grievances between the year of his hunger strike, 2020, and his transfer-out in late 2022. *Id.*; Pl.'s Doc. 85 (notice of change of address dated early December 2022, indicating that Plaintiff was transferred to SCI Albion, post-conviction, to serve his state sentence). The Jail has no record of a grievance by Plaintiff regarding the denial of eye drops during his hunger strike. *Id.* at ¶¶ 11-12.

Plaintiff has offered no competent evidence to the contrary. The two "medical" grievances he references predated his hunger strike. Doc. 144-2 at pgs. 1 & 2 (grievances dated and signed on October 26 and November 16, 2020). The third grievance identified the "Date of Complaint" as December 14, 2020 – the day before Plaintiff's transfer to 5C –

---

[2] The length of Plaintiff's detention at the Jail is unclear from the record, but it appears to have been no longer than five years.

and the form was signed and dated January 7, 2021. Doc. 144-2 at pg. 3. Tellingly, Plaintiff circled "Mental Health" as the complaint category, and the written narrative makes no reference to his eye condition. *Compare id.* (complaining about the Jail's handling of his suicide watch, between December 12th and 14th) *with* R&R (Doc. 64) at 2, 7-8 (rejecting Plaintiff's claim premised on the Jail's having made "observation rounds" every 30 minutes, instead of every 15 minutes), *adopted as opinion of Dist. Ct.* (Mem. Order filed at Doc. 68).

Plaintiff's ready production of evidence regarding contemporaneous, if unhelpful, grievances speaks volumes. His vague reference to Jail "customs" making "grievances [un]available," Doc. 144 at ¶ 4, is both belied by the record and insufficient under the law. Paladino v. Newsome, 885 F.3d 203, 208 (3d Cir. 2018) (affirming summary judgment where the plaintiff offered vague claims that prison records were "incomplete" and that staff purposefully interfered with his forms). Summary judgment is warranted on the exhaustion issue.

Even had Plaintiff exhausted, his claim would fare no better. While the brief "deprivation" of eye drops resulting from Plaintiff's hunger strike is unfortunate, it is not actionable.

Plaintiff has failed to establish that – as of December 16, 2020 (the single day the drops were not administered) – the medicinal regimen constituted a "serious" medical need. The drops initially were prescribed by Plaintiff's treating optometrist on November 2, 2020, for a two-week period. Pl.'s Doc. 144-1 at pg. 2 (the optometrist "initiate[d] Pred Acetate" for "2 weeks"). His optometrist declined to schedule a followup appointment, undermining Plaintiff's suggestion that the drops were seen by the prescriber as necessary to his recovery. Doc. 137-7 at pg. 2 (noting the optometrist's report of 11/2/2020 "[did] not mention timeframe for follow up").

4

The prescription once was extended by two weeks, by Plaintiff's optometrist; then a second time by Doctor Slava Winters, M.D.  Doc. 137-3.  There is no indication as to why Dr. Winters, who is not identified as an eye specialist, refilled the prescription – only that Plaintiff had repeatedly complained that he was "out of" the drops; and frequently complained that that his reported eye problem, along with a host of other medical conditions, were not being adequately addressed.

Nearly all indications of Plaintiff's condition, however, consisted of self-reports – and they were uniformly dire and unflaggingly persistent.  *Before and after treating with the eye drops*, Plaintiff reported that his loss of vision was gradually worsening, and that he believed or feared the loss would be permanent.  If the eye drops had any beneficial effects, they certainly were not reflected in Plaintiff's reports.  *See, e.g.*:

- **October 31st, 2020** – Plaintiff "[d]eclared he [was] trying to tell as many people as possible" about his eye "in order to 'build [his] case,'" and expressed anxiety regarding permanent vision loss, Doc. 137-1;

- **November 2nd (the day the eye drops were started)** – Plaintiff again expressed fear regarding "permanent vision changes," Doc. 146-1;

- **November 15th** – reported loss of vision, Doc. 146-1;

- **November 28th** – reported "losing more vision," Doc. 146-4;

- **December 2nd** – continued to report "gradually losing vision," Doc. 146-4;

- **December 15th** – his "vision [was] decreasing," Doc. 137-10; *but then see…*

- **December 30th** – the ophthalmologist's examination revealed "a totally normal eye exam," and signs of malingering, Pl.'s Doc. 144-1 at pg. 1;

- **January 11, 2021** – Plaintiff finally reported that his vision was "slowly improving"; *but, then again…*

5

- **January 14th** – his improvement notwithstanding, Plaintiff requested that the Dec. 30th report be uploaded to the Jail's computer system for "review during [his] next appointment."[3]

To be clear, the Court stands by its denial of Defendants' pre-discovery Motion to Dismiss. *See* Doc. 91 (finding that Plaintiff's allegations regarding "serious medical need" were sufficient at the pleadings stage). Now that the factual landscape is complete, however, the answer is different. Plaintiff has adduced *no* evidence that: (1) the eyedrops were medically "necessary"; (2) his one-day deprivation was injurious of a serious medical need; or (3) that the omission in any event rose to a level of deliberate indifference.

On the third point, the Jail's treatment cannot be divorced from the context in which it was provided. Namely, during Plaintiff's active the hunger strike.[4] Plaintiff readily admits that detainees were not permitted to bring property into 5C. The reasons for such a rule are not difficult to understand. Scenarios requiring vigilant monitoring, and hunger strikes in particular,

---

[3] It seems likely that, as of January 2021, Plaintiff had not received a copy of the report reflecting a "totally normal eye exam," and the doctor's opinion of malingering (medical-speak for "faking it"). That he since has obtained a copy, and seems to believe it *helps* his case, is harder to explain. Plaintiff is not a lawyer, and perhaps he has intuited the legal strategy of "getting out ahead of" one's weakest facts/points. At times, there are facts and issues so problematic, however, that one cannot reasonably hope to overcome them. If problematic enough, the best legal advice that can be offered is, "you have no case [or defense]."

[4] The clearest contemporaneous account of Plaintiff's thought processes were recorded (Doc. 137-10) just hours before his transfer to 5C:

> [I]nmate is very animated/agitated about 'the administration violating [his] Federal rights!' and is insistent that the guards are 'spitting in [his] food and putting hair in it and messing with it!' [The patient] states the 'food is disgusting . . . and [he] won't eat it, but [he then denied being] on a hunger strike. . . .' [He] has missed 10 [food] trays now and has no intention of eating at this point . . . [because] he is convinced the guards have it out for him and are tampering with his food . . . . [Upon being assured] that the COs were not tampering with his trays, . . . he did not believe [it] . . . . [The patient reports] generalized weakness and is worried about his blood sugar dropping low and states 'I'm gonna die in this cell.'

put detention facilities and their staff in a difficult position. On one hand, they cannot readily force a person in their custody to eat. On the other hand, they are required to meet the essential needs of the person on "strike," along with the needs of all fellow detainees. Should they draw lines incorrectly, or merely be perceived to have done so, litigation and putative liability may follow. Courts in this Circuit have recognized the implicit challenges and tensions. *See, e.g.*, the multiple rulings in [Keith Collier v. Adams, 602 Fed. Appx. 850 (Feb. 20, 2015)](#) (affirming grant of summary judgment in a hunger strike case, after multiple dispositive writings and one prior remand from the Circuit).

      Plaintiff should understand that the circumstances leading to his present claim, like the ones before it, carry at least a whiff of temerity (or, in more common terms, "chutzpah"). *See, e.g.*, discussion *supra* regarding his complaint that Jail staff should have checked on him every *15* minutes, not every *30* minutes, while he was under suicide watch. When a detainee engages in speech or conduct that, by its very nature, strains ordinary operations and consumes inordinate levels of resources – it is difficult to hear complaints that the additional effort and attention was not to their complete satisfaction. This is not to say that unconstitutional treatment is warranted or can be justified. There is no place for it, ever. It is more a recognition that imperfections, falling well short of deliberate indifference, are not likely to be received with an abundance of enthusiasm or sympathy.

      These observations are not necessary to the Court's rulings, and the explanations are simple. Plaintiff has failed to demonstrate exhaustion of administrative remedies. Had he exhausted, he has not shown that Defendants failed to meet a "serious medical need." Assuming Plaintiff's persistently dire self-reports reflected a serious medical condition, his one-day failure to receive eye drops did no violence to it – especially given his "totally normal eye

7

exam" two weeks later. And he has not come close to showing that Defendants acted with deliberate indifference under controlling legal standards – before, during or after his hunger strike. *See* discussions *supra*; *see also, e.g.*, Williams v. Luther, 2024 WL 3572344, *6-8 (W.D. Pa. Jun. 25, 2024) (six-day failure to approve contact lens provisions in RHU did not constitute deliberate indifference, for many of the same reasons identified above); Vargas v. Hudson Cty. Corr. Ctr., 2024 WL 1715335, *4 (D.N.J. Apr. 22, 2024) (a three-day delay in providing medical treatment for a broken finger did not establish deliberate indifference); Begandy v. Wellpath, 2022 WL 18282896, *7 (W.D. Pa. Oct. 27, 2022) (holding the same where the plaintiff went without pain medication for eight days); Ayala v. Terhune, 195 Fed. Appx. 87, 91 (3d Cir. Apr. 22, 2006) (non-binding decision, cited as persuasive authority only) (affirming grant of summary judgment where the plaintiff had ulcerative colitis, and suffered "sporadic delays (not exceeding four days at any one time)" in receiving prescription medication) (parentheses in original).[5]

---

[5] Although Plaintiff's operative pleadings target the hunger strike, his summary judgment filings subtly attempt to expand the scope. His evidence, and thus his effort, fails. Conclusory allegations cannot suffice, *see* fn. 1 *supra*, and Defendant's evidence reveals that Plaintiff's eye complaints received ample attention and treatment. Monmouth Cty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) (where the plaintiff has received some treatment, allegations amounting to "mere disagreement as to the proper medical treatment" are insufficient). Plaintiff also cannot overcome Defendants' arguments under Spruill v. Gillis. Id., 372 F.3d 218, 236 (3d Cir. 2004) (absent a reason to believe or actual knowledge that medical providers are mistreating or not treating a detainee, non-medical prison officials cannot be shown to meet the scienter (i.e., intentionality) requirement of deliberate indifference). There is no evidence that Defendants knew or had reason to believe Plaintiff's treatment was inadequate. Finally, even had Plaintiff overcome all the hurdles already discussed, he offers no resistance to Defendants' assertion of qualified immunity. Rivera v. Redfern, 98 F.4th 419, 424-25 (3d Cir. 2024) (reexamining precedent holding, within the context of deliberate indifference, that the merits and qualified immunity analyses merge into a single inquiry, and finding the defendant-prison officials entitled to qualified immunity). Here, the Court defines the right allegedly violated, at an "appropriate level of specificity," as follows: did Defendants act with deliberate indifference in following the Jail's undisputed policy of prohibiting detainees from bringing property into unit 5C – including medication previously released into direct possession of the detainee – for a period of one day, after which the medicine was resumed? While there is some legal precedent indicating that brief deprivations *may* be actionable (under more egregious

Plaintiff's eagerness for his "day in court" has been evident, from the docket and in the underlying record. *Cf., e.g.*, Doc. 137-1 (Plaintiff was "trying to tell as many people as possible" of his grievance, "in order to 'build [his] case'"); Doc. 137-8 (Plaintiff complained that "his blood sugar [was] low," despite his "ab[ity] to yell at [the authoring] nurse" and "threaten[] to incl[ude her] in a lawsuit"); Doc. 137-10 (Plaintiff became "very animated/agitated about 'the administration['s] violat[ions of his] Federal rights!'"). He has, by now, enjoyed it. Although he may be disappointed in the outcome, the Court has spared no detail in reviewing the record and explaining its rulings. Defendants are entitled to summary judgment.

Consistent with the above, the Court hereby enters the following:

## II. ORDER

Defendants' Motion for Summary Judgment (**Doc. 136**) is **GRANTED**. The Court will enter judgment pursuant to Fed. R. Civ. P. 58, and the case will be marked closed.

IT IS SO ORDERED.

December 31, 2024                                   s/Cathy Bissoon
                                Cathy Bissoon
                                United States District Judge

cc (via ECF email notification):

All Counsel of Record

---

circumstances), the Court is aware of no legal authority finding constitutional infirmity when a temporary deprivation resulted from an untargeted application of a neutral, rational policy limiting the possessory rights of inmates held in a unit specially designed for intensive monitoring and rapid intervention.

cc (via First-Class U.S. Mail):

Justin M. Miller
DOC# NM1628
SCI Houtzdale
P.O. Box 1000
209 Institution Drive
Houtzdale, PA  16698-1000